UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DANIEL K. MONKO,

                                          Plaintiff,

                                                                                9:11-CV-1218

v.

                                                                                (GTS/TWD)

ROBERT CUSACK, CORRECTIONS OFFICER;
GERALD GARDNER, CORRECTIONS
LIEUTENANT,

                                          Defendants.
_____

APPEARANCES:                                         OF COUNSEL:

DANIEL K. MONKO
Plaintiff *pro se*
87-A-4441
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902

HON. ERIC T. SCHNEIDERMAN           KEVIN P. HICKEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983,

has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and

N.D.N.Y. L.R. 72.3(c).[1] Plaintiff alleges in his Amended Complaint that Defendant Robert

Cusack ("Cusack"), a Corrections Officer at Shawangunk Correctional Facility ("Shawangunk"),

---

[1] *See* Text Entry of October 29, 2012.

violated his First and Fourteenth Amendment rights by filing two false misbehavior reports against him in retaliation for Plaintiff's verbal complaint to regular area supervisor, Corrections Sergeant Lutz ("Lutz"), that he was not being given contraband receipts when food items were removed from his cell. (Dkt. No. 28-3 at 41-43.) Defendant Gerald Gardner ("Gardner"), a Corrections Lieutenant at Shawangunk and hearing officer at the disciplinary proceedings on the two misbehavior reports, is alleged to have found Plaintiff guilty despite the clear and compelling nature of Plaintiff's defense, and to have imposed sanctions against him. (Dkt. Nos. 12 at ¶¶ 57-62; 12-2 at 21-22, 33-34.) Plaintiff has asserted claims against Gardner for both retaliation and for violation of his Fourteenth Amendment right to due process in finding Plaintiff guilty of the charges in the allegedly false misbehavior reports. (Dkt. No. 12 at ¶¶ 83-84, 87-88.)

Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 28.) Plaintiff has opposed the motion. (Dkt. No. 35.) For the reasons that follow, I recommend that Defendants' motion be granted.

## I. BACKGROUND

### A. Daily Cell Searches and Confiscation of Food Without Issuing Contraband Receipts

Plaintiff has been incarcerated within the Department of Corrections and Community Supervision ("DOCCS") system since September of 1985. (Dkt. No. 28-3 at 13.) During the late summer and early fall of 2010, the time period relevant to Plaintiff's claims, he was confined at Shawangunk. *Id*. at 14, 16. Plaintiff had been at Shawangunk since 2001. *Id*. at 14.

Plaintiff was placed in the Special Housing Unit ("SHU") at Shawangunk in early August

2

of 2010 for a contraband-related infraction. *Id*. at 26; Dkt. No. 28-4 at ¶ 7. He was housed with twelve or so other inmates when corrections officer David Degraff ("Degraff") moved from the night shift to the day shift. (Dkt. No. 28-3 at 16.) During the months of July and August of 2010, every time one particular inmate left his cell for a shower or his hour of recreation, Degraff went into his cell and took out food items. *Id*.; Dkt. No. 12 at ¶ 22. When that inmate began writing grievances complaining that Degraff was singling him out, Degraff started going into all of the inmate's cells and removing, among other things, food items that inmates had saved from breakfast to consume later in the day. (Dkt. No. 12 at ¶ 23.) Degraff told inmates who complained that they could blame the inmate who had filed the grievances. (Dkt. No. 28-3 at 18-19.) On September 10, 2010, when it became clear to Plaintiff that Degraff was trying to pit one inmate against another, Plaintiff complained verbally to Lutz about DeGraff's conduct and also wrote to the DOCCS Inspector Generals Office. (Dkt. No. 12 at ¶ 22.) Plaintiff told both Lutz and the Inspector Generals Office that Degraff was the only corrections officer performing the daily searches and removing food items. *Id*. at ¶ 29.

Plaintiff initially believed that Lutz would instruct Degraff to stop the searches. (Dkt. No 12 at ¶ 31.) Instead, beginning in September of 2010, all of the corrections officers, including Defendant Cusack, began going into the SHU inmates' cells and removing the inmates' things, including food items, on a daily basis, without leaving contraband receipts. (Dkt. No. 28-3 at 21-23, 28.) According to Plaintiff, because contraband receipts were not being issued, there was no record of the cell searches and inspections. (Dkt. No. 12 at ¶ 32.)

Plaintiff filed a grievance on October 10, 2010, complaining that contraband receipts were not being left when food items were removed from his cell. (Dkt. Nos. 12 at ¶ 33;12-2 at

3

13-14.) Lutz submitted an October 16, 2010, memorandum to the Inmate Grievance Program Supervisor responsive to the grievance. (Dkt. No. 12-2 at 15.) The memorandum stated that on or about September 10, 2010, Lutz had instructed the floor officers that he expected them to conduct daily cell inspections in addition to daily cell searches and, as had been the practice, to confiscate contraband, including but not limited to "food, food containers, and drag lines," in plain view.[2] *Id.*; Dkt. No. 28-4 at ¶ 12. Lutz explained in the memorandum that visual inspections "are a good security practice to minimize the introduction of contraband in the Special Housing Unit." (Dkt. No. 12-2 at 15.) Lutz also disclosed in the memorandum that he had instructed the officers to give inmates contraband receipts for any items taken from their cells. *Id.* On October 20, 2010, the Inmate Grievance Review Committee concluded that contraband receipts should be given for items taken out of inmates' cells. *Id.* at 16.

Prior to the determination of Plaintiff's grievance, on October 12, 2010, Cusack performed a regular scheduled search of Plaintiff's cell.[3] (Dkt. No. 28-3 at 28, 30-31.) During the search, Cusack confiscated state food, an extra state towel, and a fishing pole from Plaintiff's cell and left a contraband receipt.[4] (Dkt. No. 28-7 at 1.) According to Cusack, contraband receipts are required whenever a cell search is conducted whether or not contraband is found.

---

[2] Cusack explained in his Affidavit that "[a]lthough food is generally harmless in its original form, it can be altered or changed into may improper forms [e.g., fruit can be fermented into prison wine] if not properly controlled." (Dkt. No. 28-4 at ¶ 6.)

[3] Plaintiff described the scheduled cell search as one done when an inmate's name comes up on the computer, and a thorough search of the inmate's property is conducted. (Dkt. No. 28-3 at 28.)

[4] A fishing pole is a drag line crafted by prisoners and used as a tool to pass and retrieve items between inmates. (Dkt. Nos. 28-3 at 23; 28-4 at ¶ 15.) It is considered contraband. *Id.*

4

(Dkt. No. 28-4 at ¶ 16.) Plaintiff had no complaint with the regular cell search, except for his belief that there was no rule in effect prohibiting inmates from keeping food in their cells at the time. (Dkt. No. 28-3 at 30-31.) Cusack, on the other hand, believed that all of the items confiscated from Plaintiff's cell were contraband and violated SHU policy. (Dkt. No. 28-4 at ¶ 17.) While Cusack believed that the items warranted confiscation, he did not issue a misbehavior report because it appeared to be an isolated incident. *Id.* In addition, it was Cusack's understanding from his training and experience that misbehavior reports are issued at the discretion of the corrections officer depending on the circumstances, and at that time Cusack believed discarding the items would resolve the issue. *Id.* at ¶ 18.

The following day, October 13, 2010, while Plaintiff was in the yard, Cusack conducted a visual inspection of Plaintiff's cell and confiscated a container of milk and four slices of bread that were in a paper bag in his cell.[5] (Dkt. No. 28-3 at 31-33.) Cusack, believing that contraband receipts were not required for items found in a visual cell inspection, did not give Plaintiff a contraband receipt. (Dkt. Nos. 12 at ¶ 37; 28-4 at ¶ 22.) Cusack claims to have warned Plaintiff that he was not allowed to keep food items in his cell. (Dkt. No. 28-4 at ¶ 21.) Plaintiff contends that Cusack never gave him a direct order or any sort of direction on whether he could have food in his cell. (Dkt. No. 35 at p. 10, ¶ 23.)

---

[5] Plaintiff, who converted to Judaism in 2005, received the Kosher cold alternative diet, which contained substantially more unprepared foods, including fruits and vegetables, than the regular meals served to the majority of inmates. (Dkt. No. 12 at ¶¶ 21-22, 34.) Because it was difficult to consume an entire meal in the short time allotted, Plaintiff was in the habit of saving his fresh fruits and vegetables to be consumed during the day. *Id.* at ¶ 34. Plaintiff had also been given authorization to keep the containers of milk given to him with breakfast when the milk was frozen. (Dkt. No. 28-3 at 32-33.)

5

The morning of October 14, 2010, Plaintiff made a verbal complaint to Lutz regarding Cusack's failure to give Plaintiff a contraband receipt for the food items he had confiscated the day before. (Dkt. Nos. 28-3 at 33-34;12 at ¶ 38.) Fifteen or twenty minutes later, Cusack and another corrections officer escorted Plaintiff to the yard for his recreation period. *Id*. at ¶ 40. According to Plaintiff, as they were walking towards the yard, Cusack said "So you want me to give you a contraband receipt for the food items I removed from your cell yesterday?"[6] Plaintiff replied, "If you are saying that the food items are contraband, then yes I want a contraband receipt." Cusack then asked Plaintiff, "Do you want the misbehavior report that's gonna come with it?"[7] Plaintiff replied "If you are saying I broke a rule, then yes, I'll take that as well." Plaintiff then said "There is no rule saying we can't keep food in our cells." Cusack responded "we'll see." (Dkt. No. 35 at ¶ 24.) When Plaintiff returned to his cell after recreation, he noticed that Cusack had removed an apple, a banana, and half of a cucumber and had left contraband receipts for the food taken on October 13th and 14th. (Dkt. Nos. 12 at ¶ 41; 35 at ¶ 25.)

B.     **Misbehavior Reports and Plaintiff's Disciplinary Hearings**

The following day, Plaintiff was given two Tier II misbehavior reports written by Cusack. (Dkt. No. 12 at ¶ 42.) The first misbehavior report involved Cusack's October 13, 2010 visual inspection of Plaintiff's cell and confiscation of Plaintiff's milk and bread. (Dkt. No. 12-2 at 20.)

---

[6] Cusack claims to have asked Plaintiff "in words or substance, whether he truly wanted to received contraband receipts for food items [Cusack] felt constituted illegal contraband." (Dkt. No. 28-4 at ¶ 21.)

[7] According to Cusack, he asked Plaintiff "in words or substance, whether he also wanted the misbehavior report that would result from his disregard for SHU rules." (Dkt. No. 28-4 at ¶ 28.)

6

Cusack indicated in the misbehavior report that Plaintiff "has been previously told that he can not keep food items in his cell." *Id*. Plaintiff was charged with possession of contraband, having an untidy cell or person, refusing a direct order, and property damage or loss. (Dkt. No. 28-15 at 1.) The second misbehavior report, which involved the confiscation of the banana, apple, and half a cucumber from Plaintiff's cell on October 14, 2010, included the same charges as the first. (Dkt. No. 12-2 at 32.) The misbehavior reports were endorsed by Lutz. (Dkt. Nos. 28-11 at 9; 28-13; 28-14.)

Defendant Gardner, as hearing officer, made a determination to hold a separate disciplinary hearing for each of the misbehavior reports. (Dkt. Nos. 28-11 at 1, 3; 28-12 at 1.) The disciplinary hearings were held on October 19th and 20th of 2010.[8] (Dkt. No. 28-11 at 1.) Plaintiff pleaded not guilty to the charges at both hearings. (Dkt. Nos. 28-11 at 2; 28-12 at 3.) Plaintiff argued that there was no rule prohibiting him from saving food given to him at meals, and that neither Cusack nor any other corrections officer or sergeant had given him a direct order that he could not keep food in his cell. (Dkt. Nos. 28-11 at 5-6; 28-12 at 4.) Cusack testified that he had told Plaintiff he could not keep food in his cell prior to writing the misbehavior reports. (Dkt. No. 28-11 at 15-17.) When asked if he had given Plaintiff a "direct order" to that effect, Cusack testified that while he had not used the words "direct order," when he makes a statement to an inmate, the statement constitutes a direct order whether he uses the word "direct order" or

---

[8] The transcripts from the hearings, submitted by Defendants in support of their motion for summary judgment, contain a substantial number of gaps in the testimony. (Dkt. Nos. 28-11 and 28-12.)

not.[9] *Id*. at 16-17.

In their testimony at the hearings, Lutz and Cusack both identified Section 2.401, subsection 5, of the SHU rulebook as the source of the rule prohibiting inmates from keeping food in their cells.[10] (Dkt. Nos. 28-11 at 14; 28-12 at 8, 13.) The rule provides:

> Inmates will receive their meals in a food tray (unless on a restricted diet) and are expected to return both parts of that tray, utensils, and all other foods/liquid containers at the completion of each meal. Failure to do so will be considered a violation of Standards of Inmate Behavior Rule 116.10 and will result in a Tier III misbehavior report and pre-hearing restricted diet. Damage to the trays will be considered a violation of Standards of Inmate Behavior Rule 116.10 and may result in the requirement that monetary restitution be made.

(Dkt. No. 28-8 at 1.) Plaintiff argued that the provision applied only to containers, not food. (Dkt. No. 28-12 at 4.) Cusack testified that he considered food in inmates cells to be contraband according to the Rulebook provision. *Id*. at 12-13; *see also* Dkt. No. 28-4 at ¶¶ 19-20.

Lutz acknowledged telling Plaintiff on October 14, 2010, that he was supposed to have been given a contraband receipt for the food taken from his cell on October 13, 2010. *Id*. at 9. Lutz also testified that he had told Cusack to give Plaintiff a receipt. *Id*. Gardner, over Plaintiff's objection and without explanation, refused to ask Lutz whether he had instructed Cusack to write the misbehavior report or Cusack had done it on his own. *Id*. at 10-11. However, Cusack testified that Lutz did not direct him to write the misbehavior reports. (Dkt.

---

[9] Lutz testified that when Cusack told Plaintiff he could not keep food in his cell, it constituted a "direct order." (Dkt. No. 28-12 at 10.)

[10] The referenced SHU rulebook is SHU/PC/IPC Guidelines & Regulations No. 2.401. (Dkt. No. 28-8.) The provision at issue is subsection 6 of part V. Disciplinary Special Housing Rules (Directive 4933), not subsection 5. (Dkt. No. 28-8.)

8

No. 28-11 at 13.)

Cusack testified at the hearings that if Plaintiff had not asked for contraband receipts, he would not have written the two misbehavior reports. (Dkt. Nos. 28-11 at 14; 28-12 at 11-13.) When asked why he had written the misbehavior reports, Cusack testified that because once Plaintiff asked for the contraband receipts, Cusack wanted to make it official – have everything on record. (Dkt. No. 28-12 at 15.)

Gardner found Plaintiff guilty of having contraband in his cell and refusing a direct order at the end of the disciplinary hearings on the two misbehavior reports and not guilty of untidy cell or person and property damage or loss. (Dkt. Nos. 28-15 at 1; 28-16 at 1.) The only penalty imposed on Plaintiff in connection with the guilty finding on the misbehavior report dealing with the October 13, 2010 contraband incident was counseling and reprimand. (Dkt. No. 28-15 at 1.) The penalty imposed in connection with the guilty finding on the misbehavior report for the October 14, 2010 contraband incident was thirty days keeplock and thirty days loss of packages, commissary, and phone. (Dkt. No. 28-16 at 1.) According to Plaintiff, he lost his post-adjustment privileges – extra benefits such as headphones, extra clothing and personal property – for approximately a month as a result of the misbehavior reports. (Dkt. No. 28-3 at 45-46.)

C.  **Reversal of the Guilty Findings and Revision of the SHU Rulebook**

Plaintiff appealed the two determinations of guilt to Shawangunk Superintendent Joseph T. Smith, who designated Deputy Superintendent John Maly ("Maly") to handle the appeals. (Dkt. Nos. 12 at ¶¶ 63-65; 12-2 at 24-29, 36-39.) On February 9, 2011, Maly reversed both of the disciplinary hearing determinations and directed that all records of the hearings be expunged. (Dkt. No. 12-2 at 29-30, 39-40.) As a result of the expungement, the thirty days of keeplock was

9

never imposed on Plaintiff. (Dkt. No. 28-3 at 46.) The same day the determinations were reversed, Maly issued a memorandum effective immediately prohibiting inmates in SHU from possessing unconsumed food and requiring unconsumed food to be returned with the feeding utensils at the end of each meal.[11] (Dkt. No. 28-19.) The memorandum stated that unconsumed food items retained by inmates after the meal period is over would be considered contraband. *Id*. The SHU rulebook section relied upon by Lutz and Cusack at Plaintiff's disciplinary hearings was revised on February 14, 2011, to add subsection 7, which provides that "Inmates must consume all meals at the time served. Inmates are not allowed to store food in their cell." (Dkt. No. 28-20.)

## II.     PROCEDURAL HISTORY

Plaintiff commenced this action on October 11, 2011. (Dkt. No. 1.) His application to proceed *in forma pauperis* was granted on November 11, 2011. (Dkt. Nos. 2, 4.) On December 12, 2011, Plaintiff filed an Amended Complaint, which was accepted as the operative pleading in this lawsuit by Order dated December 14, 2011. (Dkt. Nos. 12, 13.)

Defendants filed their Answer to Plaintiff's Amended Complaint on January 19, 2011 (Dkt. No. 14), and a day later, Plaintiff filed a motion for partial summary judgment on liability and for an order directing Defendants to produce certified copies of the transcripts from the two disciplinary hearings at issue in the lawsuit. (Dkt. No. 16.) Defendants moved for denial of Plaintiff's motion for partial summary judgment without prejudice on the grounds that it was premature. (Dkt. No. 17.) In response, Plaintiff requested that he be allowed to withdraw the

---

[11] Cusack understands that the guilty findings were expunged because the rule on which he and Lutz had relied in deciding that inmates were not allowed to keep food in their cells was deemed ambiguous. (Dkt. No. 28-4 at ¶ 53.)

motion as premature. (Dkt. No. 18.) Plaintiff's request was granted by Text Order dated January 1, 2012.

Following discovery, Defendants filed the motion for summary judgment now before me for report and recommendation. (Dkt. No. 28.) Plaintiff thereafter filed papers in opposition to the motion. (Dkt. No. 35.)

### III.  APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.[12] *Salahuddin*, 467

---

[12]  Only admissible evidence need be considered by a court in ruling on a motion for summary judgment, and the court has "broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 582 F.3d 244, 264 (2d Cir. 2009). Because Plaintiff's Amended Complaint (Dkt. No. 12) is verified, it will be treated as an affidavit in opposition to Defendants' summary judgment motion. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). The Affirmation submitted by Plaintiff in opposition to Defendants' motion (Dkt. No. 35 at 5-14) is unsworn and was not signed under penalty of perjury. *See* 28 U.S.C. § 1746 (authorizing the use of declarations made under penalty of perjury when an affidavit is required or permitted to be used); *see also* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362-63 (Civil 3d ed. 1998) (affidavits submitted for or in opposition to a motion for summary judgment need not be notarized when

F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[13] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

they are made under penalty of perjury, but unsworn statements will be rejected). However, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider papers that did not constitute affidavits or declarations. *See, e.g., Robles v. Khahaifa*, No. 09CV718, 2012 WL 2401574, at *7, 2012 U.S. Dist. LEXIS 87834, at *20-22 (W.D.N.Y. June 25, 2012). In light of Plaintiff's *pro se* status, and because: (1) Plaintiff explained in his Affirmation that he was unable to submit a sworn affidavit because notary service was unavailable (although he presumably could have signed the Affirmation under penalty of perjury); (2) Defendants have not objected to consideration of the Affirmation; and (3) the Affirmation is generally consistent with the allegations in Plaintiff's Amended Complaint and his deposition testimony submitted as an Exhibit by Defendants, I have considered the Affirmation in opposition to Defendants' motion.

[13] Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk.

## IV. ANALYSIS

### A. Retaliation Claim Against Cusack

Plaintiff claims that Defendant Cusack filed two false misbehavior reports against him in retaliation for Plaintiff going over his head and complaining to Lutz that corrections officers, including Cusack, were confiscating food from inmates' cells without giving the inmates a contraband receipt. (Dkt. No. 28-3 at 41-43.) "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). False accusations contained in a misbehavior report can, however, rise to the level of a constitutional violation when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak*, 389 F.3d at 381-83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because

13

> virtually any adverse action taken against a prisoner by a prison
> official--even those otherwise not rising to the level of a constitutional
> violation--can be characterized as a constitutionally proscribed
> retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action--in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill*, 389 F.3d at 381, 383 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 493.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include: (i) the temporal proximity between the protected activity and the

alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

The protected First Amendment conduct on which Plaintiff relies in his retaliation claim is his complaint to Lutz that corrections officers were confiscating food from inmates' cells without giving the inmates contraband receipts. (Dkt. No. 28-3 at 41-43.) An inmate's verbal complaint to a corrections officer might serve as the basis for a § 1983 retaliation claim. *Smith v. Woods*, No. 9:03-CV-480, 2006 WL 1133247, at *10, 2006 U.S. Dist. LEXIS at 29745 at *46 (N.D.N.Y. April 24, 2006) (finding that oral complaints made to corrections officers may have First Amendment protection for purposes of a retaliation claim), *aff'd*, 219 F. App'x 110 (2d Cir. 2007); *Brewer v. Kamas*, 533 F. Supp.2d 318, 328 (W.D.N.Y. 2008) (same). Therefore, the evidence may support a finding that Plaintiff was engaging in protected conduct when he complained to Lutz.

However, the evidence does not support a finding of adverse action. Defendant Gardner imposed a penalty of only counseling and reprimand upon finding Plaintiff guilty after the hearing on the first misbehavior report. (Dkt. No. 28-15 at 1.) Gardner imposed a penalty of thirty days in keeplock, and thirty days loss of packages, commissary, and phones on the second. (Dkt. No. 28-16.) However, Plaintiff, by his own admission, did not spend any time in keeplock and testified at his deposition that his damages as a result of the finding of guilt were limited to a thirty-six day loss of post-adjustment privileges, including things like radio, headphones, and personal photographs. (Dkt. No. 28-3 at 46-48.) "The filing of misbehavior reports that result

in a temporary loss of various privileges such as permission to visit the commissary [does] not constitute adverse action because they are *de minimis*." *Gantt v. Lape*, No. 9:10-CV-0083 (GTS/GHL), 2012 WL 4033729, at *8, 2012 U.S. Dist. LEXIS 130052, at *24-25 (N.D.N.Y. July 31, 2012); *see also Bartley v. Collins*, No. 95-CV-10161(RJH), 2006 WL 1289256, *7, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 10, 2006) ("Bates' misbehavior report against plaintiff and Collin's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary . . . do not constitute adverse action because they were too *de minimis*; they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights."); *Shaheen v. McIntyre*, No, 9:05-CV-0173 (TJM/GHL), 2007 WL 3274835, at *9, 2007 U.S. Dist. LEXIS 81895 (N.D.N.Y. Nov. 5, 2007) ("allegations of lost privileges, standing alone, would be too *de minimis* to constitute 'adverse action'").

Even giving due consideration to Plaintiff's argument that because SHU inmates have so few privileges, losing what they do have is a significant loss (Dkt. No. 35 at 31), I find that Plaintiff's temporary loss of post-adjustment privileges in this case is too *de minimis* to constitute adverse action for purposes of his retaliation claim against Cusack.[14] Therefore, I recommend that the Court grant Defendant Cusack's motion for summary judgment.

    B.    **Retaliation and Due Process Claims Against Gardner**

        1.    <u>Retaliation</u>

Plaintiff claims that Gardner retaliated against him by failing to take steps in his

---

[14] While it is not entirely clear from the summary judgment record whether the thirty day loss of privileges imposed on Plaintiff by Gardner on the second misbehavior report was also carried out, even if it were, the penalty would be too *de minimis* to constitute adverse action.

supervisory capacity to rectify Cusack's issuance of false misbehavior reports and by finding him guilty at the disciplinary hearings despite the clear and convincing evidence of his innocence. (Dkt. Nos. 12 at ¶¶ 83-84, 28-3 at 70-72.) As discussed above with regard to Plaintiff's retaliation claim against Cusack, the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are *de minimis* and do not constitute adverse action for purposes of a retaliation claim. *See Bartley v. Collins*, 2006 WL 1289256, at *7. Therefore, I recommend that Gardner be granted summary judgment dismissing Plaintiff's retaliation claim against him.

2.  Due Process

Plaintiff claims that Gardner denied his Fourteenth Amendment right to due process by finding him guilty of the charges of possessing contraband and refusing a direct order in each of the two misbehavior reports filed by Cusack, despite clear and compelling evidence at the hearings that the charges were false and without merit, and the misbehavior reports had been written in direct retaliation for Plaintiff's verbal grievance to Lutz. (Dkt. Nos. 12 at ¶¶ 84, 88; 28-15 at 1; 28-16 at 1.)

To prevail on a § 1983 claim for denial of Fourteenth Amendment procedural due process rights, a plaintiff must demonstrate that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000). Due process generally requires that "some kind of hearing" be provided to an individual by the state prior to depriving them of a property or liberty interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate can show deprivation of a liberty interest under the due process clause when a

prison condition imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (same). There is no evidence that counseling and reprimand constitutes an atypical and significant hardship. (Dkt. No. 28-15 at 1.) Furthermore, Plaintiff did not serve any of the thirty days in keeplock, and it appears that the penalty of thirty day loss of packages, commissary, and phone may not have been carried out either. (Dkt. No. 28-16 at 1.) At most, the evidence shows that Plaintiff lost his post-adjustment privileges – extra benefits such as headphones, extra clothing and personal property – for thirty-six days. *Id*. at 45-46.

"[T]he loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord*, 441 F. Supp.2d 631, 640 (S.D.N.Y. 2006); *see also Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998) (holding temporary loss of various privileges – telephone, package, commissary and recreation – did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate"); *Johnson v. Enu*, No. 08-CV-158 (FJS/DRH), 2011 WL 3439179, at *12, 2011 U.S. Dist. LEXIS 86831, at *34-35 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Edelkind v. Killian*, No. 09 Civ. 5835 (SHS)(MHD), 2011 WL 10599973, at *16, 2011 U.S. Dist. LEXIS 157207, at *46 (S.D.N.Y. Aug. 31, 2011) ("loss of telephone privileges is plainly a common incident of prison life and hence does not itself reflect a circumstance that implicates the loss of a liberty interest.").

I find that Plaintiff's thirty-six day loss of post-adjustment privileges, and a thirty day loss of telephone, commissary, and recreation, if those losses in fact occurred, do not give rise to a

protected liberty interest.  Therefore, I recommend that Defendant Gardner also be granted summary judgment dismissing Plaintiff's claim against him for denial of Plaintiff's Fourteenth Amendment due process rights in connection with the hearings on the misbehavior reports written by Defendant Cusack.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **GRANTED** and that the Court enter judgment in Defendants' favor; and it is

**ORDERED** that the Clerk provide Plaintiff with copies of all of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: July 25, 2013
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge